## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **UNDER ARMOUR, INC.** )<br>1020 Hull Street )<br>Baltimore, Maryland 21230, )<br> )<br>Plaintiff, )<br> )<br>v. )<br> )<br>**AGEAS INC.** )<br>7200 Missouri Avenue )<br>Denver, Colorado 80246 )<br> )<br>Defendant. )<br>———————————————————)| Civil Action No.<br><br>**JURY TRIAL**<br>**DEMANDED** |

## COMPLAINT

Plaintiff Under Armour, Inc. alleges as follows, upon actual knowledge with respect to itself and its own acts, and upon information and belief as to all other matters:

### NATURE OF THE ACTION

1.     This is a civil action for trademark infringement, trademark dilution, and unfair competition under the Lanham Act, 15 U.S.C. § 1051, *et seq.* and/or Maryland statutory and/or common law.  Under Armour seeks equitable and monetary relief from Defendant's willful violation of Under Armour's trademark rights in its famous  mark.

2.     Defendant has been offering, selling, and promoting apparel, footwear, headwear, and accessories—including for sports, athletics, and fitness—under the  mark in violation of Under Armour's trademark rights.  Defendant's copycat logo has already caused confusion and gives Defendant an unfair boost in the marketplace at the expense of both Under Armour and consumers.

## PARTIES

3.      Plaintiff Under Armour is a Maryland corporation with a principal place of business at 1020 Hull Street, Baltimore, Maryland 21230.

4.      Defendant Ageas, Inc. is a Colorado corporation with a place of business at 7200 Missouri Avenue, Denver, Colorado 80246.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction over the subject matter of this action pursuant to 15 U.S.C. § 1121 and 28 U.S.C. §§ 1331, 1338(a) and (b).  Because Under Armour is a citizen of the State of Maryland, Defendant is a citizen of the State of Colorado, and the matter in controversy exceeds $75,000 exclusive of interests and costs, the Court also has jurisdiction under 28 U.S.C. § 1332.  The Court has supplemental jurisdiction over Under Armour's state-law claims pursuant to 28 U.S.C. § 1367(a) because they are substantially related to its federal claims and arise out of the same case or controversy.

6.      This Court has general and/or specific personal jurisdiction over Defendant because Defendant purposefully availed itself of the privilege of conducting business in Maryland.  Defendant offers and has sold its products bearing the  mark through its website to consumers located in Maryland and uses that mark to promote and advertise its products in Maryland and elsewhere, including via directed online pop-up ads.

7.      Venue lies in this District pursuant to 28 U.S.C. § 1391(b) and (c) because a substantial part of the events giving rise to Under Armour's claims have occurred and are continuing to occur in this District, and Under Armour's trademarks at issue are located in this District, where Under Armour maintains its principal place of business.

**UNDER ARMOUR, ITS PRODUCTS, AND ITS FAMOUS TRADEMARKS**

8.      Under Armour is one of the world's most successful, popular, and well-known providers of apparel, footwear, sporting goods, and accessories.  Through Under Armour's innovative use of advanced engineering and technology, it has revolutionized the performance-product industry.  In 2018 alone, Under Armour sold more than $5.0 billion worth of products.

9.      In 1996, Under Armour started using ⬡ as its corporate logo and trademark for apparel.  The mark was modified to ⬡ and later to ⬡ and has appeared in different stylized formats, including ⬡ and ⬡.

**UNDER ARMOUR'S SALES AND**
**PROMOTION OF ITS ⬡ BRANDED PRODUCTS**

10.     Over the years, Under Armour has expanded to a wide range of other products and services, including a full line of athletic clothing, footwear, and headwear; accessories; safety gear; tactical gear; workwear; hunting gear; and sports equipment.  The distinctive ⬡ mark has been used and promoted across Under Armour's extensive product lines.

11.     The ⬡ mark is used to identify Under Armour and its products and is prominently featured in marketing, advertising, and other materials, including throughout Under Armour's website at www.ua.com, as shown in the examples below:









Colors

2 Colors

8 Colors

2 Colors

JA Jet 2017
Men's Basketball Shoes
$44.99 - $56.24 $74.99

Pre-School UA Micro G® Rave Adjustable
Boys' Running Shoes
$35.99 $47.99

UA Threadborne Slingflex
Men's Shoes
$74.99 $99.99

UA Micro G® Assert 6
Men's Running Shoes
$52.49 $69.99





BEST
SELLER















### UA Around Town Gaiter
Women's Studio Equipment

★★★★★ 1  |  Live Chat  |  Style #1260580

$29.99

**Color:** Ox Blood (945) / Boulder

**Size:** One Size Fits All

OSFA

**Quantity:** In Stock

1   **ADD TO BAG** 🛍

🛍 SHOPRUNNER free 2-day shipping & free returns

learn more | sign in

---

1 Color Available
UA Storm Bora

*BEST SELLER*
1 Color Available
ColdGear® Infrared Powerline Insulated

1 Color Available
ColdGear® Infrared Powerline Insulated

3 Colors Available
UA Overlook





4 Colors Available
**UA Vanish Seamless Mid**
Women's Sports Bra
$40.00

3 Colors Available
**HeatGear Armour® High**
Women's Running Sports Bra
$55.00

2 Colors Available
**UA Vanish High**
Women's Studio Sports Bra
$60.00





## Boys' UA Blitzing II Stretch Fit Cap

★★★★★ 1 | 💬 Live Chat | Style #1254660

$17.99

**Color:** RISK RED (600)

Please select a size                    ✛ **Size Chart**

S/M    XS/S

**Quantity:** In Stock

1

**ADD TO CART** 🛒

🔄 **SHOPRUNNER** free 2-day shipping & free returns
learn more | sign in









| | | | |
|---|---|---|---|
| 3 Colors | 1 Color | 2 Colors | 1 Color |
| ColdGear® Infrared Fleece 2.0 | UA No Breaks Armour® Liner | UA Armour® Liner | UA ColdGear® Infrared Fleece |
| Men's Glove | Men's Running Glove | Gloves | Women's Glove |
| $22.49 $39.99 | $24.99 | $24.99 | $29.99 |











12.    The mark appears on store signage and throughout Under Armour's retail stores, e.g.:





 

13.     The ⬧ mark has been prominently featured on product packaging, stickers,

hangtags, labels, and other product materials, e.g.:



14.     In-store displays and point-of-sale promotional and marketing materials for

Under Armour's products have also prominently featured the ⬧ mark, e.g.:



15.     Under Armour has sold billions of dollars' worth of products, which are promoted, offered, and sold nationwide through a wide variety of retail means, including thousands of retail stores.  These retail stores include Under Armour's own Factory and Brand House retail stores, as well as national, regional, independent, and specialty retailers such as *Academy Sports & Outdoors*, *Bass Pro Shops*, *Cabela's*, *Foot Locker*, *Finish Line*, *Dick's Sporting Goods*, *Kohl's*, *Macy's*, *Dunham's*, *Modell's*, *Hibbett Sports*, *Nordstrom*, and *The Army and Air Force Exchange Service.*

16.     Under Armour's products are also offered, sold, and promoted through its own websites, catalogs, and toll-free call center and the websites and mail order catalogs of many of its retailers, including the websites used by *Bloomingdales.com*, *Cabela's*, *Bass Pro Shops*, *City Sports*, *Dick's Sporting Goods*, *Eastbay*, *Eastern Mountain Sports*, *Finish Line*, *Foot Locker*, *Gilt Groupe*, *Hibbett*, *LL Bean*, *Lord & Taylor*, *Macy's.com*, *MC Sports*, *Modell's*, *Nordstrom*, *Sportsman's Guide*, and *Sportsman's Warehouse.*

17.     For years, Under Armour has spent millions of dollars annually extensively advertising and promoting itself, its marks, and its products to the general public through virtually every available type of media, including print publications, signage, television, and the Internet.

18.     Under Armour also promotes itself, its marks, and its products on its own and authorized websites and social-media sites, including www.underarmour.com, www.ua.com (which redirects to www.underarmour.com), www.facebook.com/underarmour, and www.twitter.com/underarmour, among others.

19.     With respect to publications and signage, Under Armour has advertised and promoted itself, its marks, and its products in a wide variety of nationally circulated magazines

and newspapers.  Further, Under Armour and its marks have been featured on billboards and

other signage in various cities, including Baltimore, Philadelphia, and New York City's Times

Square (shown below).  The ⬥ mark has also been prominently featured in stadium and sport-

event advertising, including, for example, placement on the left outfield wall at Wrigley Field

(shown below), on the "Green Monster" at Fenway Park, and on digital signage.





20.    Additionally, Under Armour has advertised and promoted itself, its marks, and its

products through television commercials, including a television commercial during the Super

Bowl, product placement in popular movies, national television programs, video games, and coverage of sporting events featuring its branded products, among other means.

21.     Sponsorships, outfitting agreements, individual athlete agreements, and partnerships with famous celebrities represent another significant form of advertising and promotion by Under Armour.  Under Armour's marks and products are promoted through high-profile athletes and teams competing at the youth, collegiate, professional, and Olympic levels, including, for example, the most decorated Olympian of all time Michael Phelps; World Champion ski racer Lindsey Vonn; ballerina Misty Copeland; NBA basketball stars Steph Curry (Golden State Warriors) and Joel Embiid (Philadelphia 76ers); MLB baseball stars Bryce Harper (Philadelphia Phillies) and Clayton Kershaw (Los Angeles Dodgers); supermodel Gisele Bündchen; NFL football stars Tom Brady (New England Patriots), Cam Newton (Carolina Panthers), and Patrick Peterson (Arizona Cardinals); famous celebrity Dwayne "The Rock" Johnson; college sports teams Auburn, Notre Dame, Boston College, University of Maryland, Northwestern University, Navy, and South Carolina; and high school sports teams around the country.  As a result, Under Armour's products are seen in action and receive substantial exposure to consumer audiences through the Internet, television, magazines, and at live sporting events.















22.     Since 2006, Under Armour has been an authorized supplier of footwear to the NFL and is currently the official performance footwear supplier to the MLB and authorized supplier of gloves to the NFL.

23.     In addition to its own substantial advertising and promotional activities, Under Armour and its marks and products have received and continue to receive widespread unsolicited media coverage.  Indeed, many of the athletes, teams, and sporting events sponsored by Under Armour appear on nationally broadcast television programs and in widely circulated publications.

24.     Under Armour has received numerous awards for its commercial success in connection with the development of its innovative and technologically enhanced products and its marketing and branding achievements.  In 2014, Under Armour received the prestigious "Marketer of the Year" Award from *Advertising Age* magazine.  That same year, *Yahoo Finance* named Under Armour the 2014 "Company of the Year."  In 2015 and 2016, Under Armour ranked #4 (with a brand value of $5 billion in 2016 and $5.5 billion in 2016) on the Forbes list of "The World's Most Valuable Sports Brands."  In 2016, Under Armour also received the preeminent marketing industry award for the best "Ad of the Year" from *AdWeek* for its "Rule Yourself" campaign featuring the 28-time Olympic medalist, Michael Phelps.

25.     As a result of Under Armour's extensive and continuous use and advertising of its  mark, the public has been exposed to  mark and has recognized it as Under Armour's distinctive trademark for apparel, footwear, sports equipment, accessories, and related products and services.

26.     The  mark has been well known and famous for years as a result of its distinctive nature, and thus inherent strength; the widespread advertising, publicity, promotion, and sales of products in connection with the mark; and Under Armour's longstanding and extensive use of the mark.

## UNDER ARMOUR'S TRADEMARK REGISTRATIONS
## FOR ITS  MARK

27.     Under Armour owns, among others, the following valid and subsisting U.S.

federal trademark registrations for its  mark (true and correct copies of which are attached

as Exhibit A):

| Mark | Reg. No. | Reg. Date | Products/Services |
|---|---|---|---|
|  | 2727031 | 06/17/2003 | Clothing namely; shirts, hats, pants, t-shirts, underwear, brassieres, shorts, headbands, wristbands and socks, in Class 25 |
|  | 3630507 | 06/02/2009 | Full line of athletic clothing; belts; clothing, namely, hand-warmers, in Class 25 |
|  | 2951069 | 05/17/2005 | Wristbands, headbands, rain suits, jackets, socks, skirts, athletic sleeves, hoods, skull wraps, skull caps, vests, hats, shorts, shirts, leggings, pants, headwear for winter and summer, underwear, tank tops, bras, girdles, in Class 25 |
|  | 2991123 | 09/06/2005 | Gloves, in Class 25<br><br>Sports towels, in Class 24<br><br>Lanyards for holding mouthpieces, water bottles, eyeglasses, badges, or keys, in Class 22<br><br>Sports bottles, sold empty, in Class 21<br><br>Toiletry kits, sold empty, in Class 18<br><br>Chin strap pads for use with protective helmets, in Class 9 |
|  | 3178547 | 11/28/2006 | Footwear, in Class 25 |
|  | 3664983 | 08/04/2009 | Clothing for athletic use, namely, padded shirts, padded pants, padded shorts, padded elbow compression sleeves, in Class 25<br><br>Bags specially adapted for sports equipment; golf gloves; batting gloves; football gloves; lacrosse gloves; mouth guards for athletic use; cases for holding mouth guards; athletic equipment, namely, |

| Mark | Reg. No. | Reg. Date | Products/Services |
|---|---|---|---|
| | | | guards for the lips; chin pads for athletic use; knee pads for athletic use; elbow pads for athletic use; forearm pads for athletic use; shin guards for athletic use; football girdles; protective athletic cups; jock straps, in Class 28 |
| UNDER ARMOUR | 2509632 | 11/20/2001 | Clothing namely; shirts, hats, pants, t-shirts, underwear, brassiere and shorts, in Class 25 |
| UNDER ARMOUR | 2954369 | 05/24/2005 | Wristbands, headbands, rain suits, jackets, socks, skirts, athletic sleeves, hoods, skull wraps, skull caps, vests, hats, shorts, shirts, leggings, pants, headwear for winter and summer, underwear, tank tops, bras, girdles, in Class 25 |

28.     Under Armour also owns the following valid and subsisting Maryland trademark registrations for its ⊃⊂ marks (true and correct copies of which are attached as Exhibit B):

| Mark | Reg. No. | Reg. Date | Products/Services |
|---|---|---|---|
| ⊃⊂ | 2009-0060 | 05/01/2009 | Clothing and footwear, in Class 39 |
| ⊃⊂ | 2009-0061 | 05/01/2009 | Sunglasses, visors, watches, gift cards, badges and towels, in Class 50 |
| ⊃⊂ | 2009-0062 | 05/01/2009 | Protective athletic equipment and apparel, in Class 22 |
| ⊃⊂ | 2009-0063 | 05/01/2009 | Retail services, in Class 53 |
| ⊃⊂ | 2009-0064 | 05/01/2009 | Travel and sports bags, in Class 3 |

## DEFENDANT AND ITS WRONGFUL ACTS

29.     Without Under Armour's authorization or approval, Defendant has been offering, selling, and promoting apparel, footwear, and accessories under the ●● mark, e.g.:











CLASSIC EX - MEN'S SAUNA
SUIT (JACKET & PANT)

$62.09

SIZE CHART     $68.99

Size: US/EU S= ASIAN M

Color: Red

—   1   +

ADD TO CART   ·   $62.09

BUY IT NOW







MEN'S ROUND NECK QUICK DRY SPORTS TEE
$39.99

CLASSIC LEISURE- MEN'S SHORT SLEEVE T-SHIRT
$39.99



SUPPER SKINNY - MENS LEGGINGS
$59.99

MOMENT TO MOVEMENT - MEN'S LEGGINGS
$59.99



SILVER ION ANTIBACTERIAL WOMEN'S T-SHIRT
$49.99

SHORT DISTANCE - WOMEN'S T-SHIRT
$39.99



INSPIRATION - WOMEN'S TANKS
$65.99

CROP TOP WOMEN'S BACKLESS YOGA BRA
$68.99



THE QUEEN - WOMEN'S STRETCH LEGGINGS
$59.99

WISH - WOMEN'S SAUNA LEGGINGS
$53.99  $59.99



PEEK - SPORTS ENERGY BRA
$45.99

SPEED UP - SPORTS BRA
$56.99



**HOTSUIT WOMEN'S SHORT SOCKS**
$15.99

**HOTSUIT MEN'S SHORT SOCKS**
$15.99



HOTSUIT

## WAVE- WOMEN SPORTS TRAINING SHOES

$69.99

Size: US 4.5= EU 35

Color: White

− 1 +

ADD TO CART   •   $69.99

**BUY IT NOW**

**DETAIL:**

- Featured with skid resistance, antiwear, breathable, shock resistance, and lightweight.
- Distinctive heel adjustment strap gives you more convenience and highlights your unique.
- Using woven tape in the toe cap as cutting line to weaken visual emptiness, meanwhile, highlight the feet strong sense of line.



30.     Like Under Armour, Defendant promotes the ⬥ mark on the Internet via its website (https://www.hotsuit.com/) and social media, including Twitter (https://twitter.com/HOTSUITofficial), Facebook (https://www.facebook.com/Hotsuit/), and Instagram (https://www.instagram.com/hotsuit/).

31.     Under Armour has already heard from one person who confused Defendant's logo for Under Armour's when he saw it on Amazon.com, where Defendant also promotes and sells its products (https://www.amazon.com/stores/HOTSUIT/HOTSUIT/page/67B68DA2-FFC4-441C-847D-0B345A56CA11).

## DEFENDANT'S FRAUDULENT TRADEMARK APPLICATIONS

32.     On April 23, 2017, Defendant filed U.S. Application Serial No. 87421885 (the "'885 Application") for the ⬥ mark, alleging use under Section 1(a) of the Lanham Act, for "Alpenstocks; Backpacks; Handbags; Pocket wallets; Rucksacks; School bags; School satchels;

Umbrellas; Bags for sports; Mountaineering sticks; Travelling bags; Travelling trunks; Trunks"

in Class 18 with the U.S. Patent and Trademark Office ("PTO").

33.    Defendant filed the following specimens to support its allegation of first-use/first-use-in-commerce for the '885 Application:



with the following declaration signed under oath, declaring to the PTO that:

> "In International Class 018, the mark was first used by the applicant or the applicant's related company or licensee predecessor in interest at least as early as 09/10/2016, and first used in commerce at least as early as 09/10/2016, and is now in use in such commerce. The applicant is submitting one (or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods/services, consisting of a(n) digitally photographed goods."

34.    On July 24, 2017, the PTO issued an Office Action for the '885 Application,

refusing registration because the specimens submitted with the application "appear[] to consist of

a digitally altered image or a mock-up of the intended depiction of the mark on the goods or their

packaging for future use in commerce" and because "these provisional samples do not show the

applied-for mark in actual use in commerce."

35.     Defendant subsequently submitted the following alleged specimens of use with

the PTO on December 7, 2017:

  

36.     Defendant's December 7, 2017 response also contained a declaration signed

under oath stating:

> "The mark was first used at least as early as 09/10/2016 and first used in
> commerce at least as early as 09/10/2016, and is now in use in such commerce.
> Applicant hereby submits one (or more) specimen(s) for Class 018. The
> specimen(s) submitted consists of digitally photographed goods, documents, and
> the statement of the information."

37.     The December 7, 2017 specimens of use and sworn declaration were required for

'885 Application to proceed to publication.

38.     As of filing this Complaint, the ✖ mark is not in use in commerce for the

following goods identified in the '885 Application:  Alpenstocks; Backpacks; Handbags; Leather

bags; Pocket wallets; Rucksacks; Umbrellas; Mountaineering stick; Travelling trunks; and

Trunks.

39.     On April 23, 2017, Defendant filed Application Serial No. 87421889 (the "'889

Application") for the ⬡⬡ mark, alleging use under Section 1(a) of the Lanham Act, for "Cyclists'

jerseys; Footwear; Hosiery; Mufflers; Neck scarfs; Neck scarves; Sleep masks; Tights;

Waterproof jackets and pants; Caps being headwear; Clothing layettes; Gloves as clothing" in

Class 25 with the PTO.

40.     Defendant filed the following specimens to support its allegation of first-

use/first-use-in-commerce for the '889 Application:







with the following declaration signed under oath, declaring to the PTO that:

"In International Class 025, the mark was first used by the applicant or the applicant's related company or licensee predecessor in interest at least as early as 09/10/2016, and first used in commerce at least as early as 09/10/2016, and is now in use in such commerce. The applicant is submitting one (or more) specimen(s) showing the mark as used in commerce on or in connection with any item in the class of listed goods/services, consisting of a(n) digitally photographed goods."

41.     On July 24, 2017, the PTO issued an Office Action for the '889 Application, refusing registration because the specimens submitted with the application "appear[] to consist of a digitally altered image or a mock-up of the intended depiction of the mark on the goods or their packaging for future use in commerce" and because "these provisional samples do not show the applied-for mark in actual use in commerce."

42.     Defendant subsequently submitted the following alleged specimens of use with the PTO on December 7, 2017:

 

 

43.     Defendant's December 7, 2017 response also contained a declaration signed

under oath stating:

> "The mark was first used at least as early as 09/10/2016 and first used in
> commerce at least as early as 09/10/2016, and is now in use in such commerce.
> Applicant hereby submits one (or more) specimen(s) for Class 025 . The
> specimen(s) submitted consists of digitally photographed goods, documents, and
> the statement of the information."

44.     The December 7, 2017 specimens of use and sworn declaration were required for

'889 Application to proceed to publication.

45.     As of filing this Complaint, the  mark is not in use in commerce for the

following goods for the following goods identified in the '889 Application:  Cyclists' jerseys;

Mufflers; Neck scarfs; Neck scarves; Sleep masks; Clothing layettes; and Gloves as clothing.

46.     On April 24, 2017, Defendant filed Application Serial No. 87423449 (the "'449

Application") for the  mark, alleging use under Section 1(a) of the Lanham Act, for "Baby

multiple activity toys; Chess games; Exercise equipment in the nature of straps that are affixed to

exercise equipment for performance of weight resistance exercises; Golf clubs; Balls for games;

Boxing gloves; Foosball tables; Rods for fishing; Stationary exercise bicycles; Twirling batons"

in Class 28 with the PTO.

47.     Defendant filed the following specimens to support its allegation of first-

use/first-use-in-commerce for the '449 Application:

 



with the following declaration signed under oath, declaring to the PTO that:

> "In International Class 028, the mark was first used by the applicant or the
> applicant's related company or licensee predecessor in interest at least as early
> as 09/10/2016, and first used in commerce at least as early as 09/10/2016, and
> is now in use in such commerce. The applicant is submitting one (or more)
> specimen(s) showing the mark as used in commerce on or in connection with
> any item in the class of listed goods/services, consisting of a(n) digitally
> photographed goods."

48.     On July 24, 2017, the PTO issued an Office Action for the '449 Application,

refusing registration because the specimens submitted with the application "appear[] to consist of

a digitally altered image or a mock-up of the intended depiction of the mark on the goods or their

packaging for future use in commerce" and because "these provisional samples do not show the

applied-for mark in actual use in commerce."

49.     Defendant subsequently submitted the following alleged specimens of use with

the PTO on December 7, 2017:




50.     Defendant's December 7, 2017 response also contained a declaration signed

under oath stating:

> "The mark was first used at least as early as 09/10/2016 and first used in
> commerce at least as early as 09/10/2016, and is now in use in such commerce.
> Applicant hereby submits one or more) specimen(s) for Class 028 . The
> specimen(s) submitted consists of digitally photographed goods, documents, and
> the statement of the information."

51.     The December 7, 2017 specimens of use and signed declaration were required for

the '449 Application to proceed to publication.

52.     As of filing this Complaint, the �save mark is not in use in commerce for any of the

goods identified in the '449 Application.

53.     Some or all of the alleged specimens of use filed by Defendant in the '885, '889,

and/or '449 Applications were digitally created or altered and the ✖ mark was not in

commercial use for some or all of the goods identified in the applications, as identified in Paragraphs 38, 45, and 52 above.

54.     The digitally altered specimens and sworn declarations of use identified above were material to the PTO's decision to allow the '885, '889, and/or '449 Applications to publish for registration.  Defendant knew that the PTO would rely on its digitally altered specimens and false statements and knowingly made those statements with the intent to procure registrations to which Defendant was not entitled.

55.     The PTO relied on such knowingly false specimens and statements of material fact in approving the '885, '889, and/or '449 Applications for publication.

56.     Prior to publication of the '885, '889, and/or '449 Applications, Under Armour objected to Defendant's applications for, and use of, the  mark and insisted that Defendant voluntarily abandon its applications and stop all use.  Defendant did not respond, allowed each referenced application to publish, and continues to offer, sell, and promote apparel, footwear, and accessories bearing the  mark.

57.     On February 22, 2018, Under Armour filed Consolidated Opposition No. 91239790 against the '885, '889, and '449 Applications with the Trademark Trial and Appeal Board, alleging likelihood of confusion, dilution, and fraud on the PTO.  That proceeding is currently ongoing.

58.     In the face of Under Armour's objections and Defendant's lack of use for many of the applied-for goods, Defendant filed three additional U.S. Trademark Applications with the PTO, each one alleging use under Section 1(a) of the Lanham Act for the mark  , on May 16, 2019—one covering "Alpenstocks; Backpacks; Handbags; Leather bags; Pocket wallets;

Rucksacks; Umbrellas; Bags for sports; Clothing for pets; Imitation leather; Mountaineering sticks; Trunks being luggage" in Class 18 (App. No. 88434376) (the "'376 Application"); the second covering "Girdles; Hats; Hosiery; Kerchiefs; Shoes; Swimsuits; Tops as clothing; Trousers; Waterproof jackets and pants; Baby layettes for clothing; Bathing suits" in Class 25 (App. No. 88434452) (the "'452 Application"); and the third covering "Chess games; Gaming equipment, namely, slot machines with or without video output; Manually-operated exercise equipment for physical fitness purposes; Plush toys; Archery implements; Balls for games; Body-building apparatus; Body-training apparatus; Boxing gloves; Punching bags; Rods for fishing" in Class 28 (App. No. 88434461) (the "'461 Application").  All three applications published for opposition on September 10, 2019, and Under Armour sought and received 90-day extensions to oppose each application on September 11, 2019.

59.     In connection with each of the '376, '452, and '461 Applications, Defendant submitted a declaration signed under oath to the PTO, declaring that "[Defendant] is using the mark in commerce on or in connection with the identified goods/services."

60.     As of filing this Complaint, the  mark is not in use in commerce for any of the following goods identified in the '376, '452, and '461 Applications:  Alpenstocks; Handbags; Pocket wallets; Rucksacks; School bags; School satchels; Umbrellas; Mountaineering sticks; Travelling bags; Travelling trunks; Trunks; Girdles;  Kerchiefs; Swimsuits; Baby layettes for clothing; Bathing suits; Gaming equipment, namely, slot machines with or without video output; manually-operated exercise equipment for physical fitness purposes; Plush toys; Archery implements; Balls for games; Body building apparatus; Body-training apparatus; Boxing globes; Punching bags; and Rods for fishing.

61.     The signed declarations of use identified above in Paragraph 59 were material to the PTO's decision to allow the '376, '452, and/or '461 Applications to publish for registration. Defendant knew that the PTO would rely on its false statements and knowingly made those statements with the intent to procure registrations to which Defendant was not entitled.

62.     The PTO relied on such knowingly false statements of material fact in approving the '376, '452, and '461 Applications for publication.

### INJURY TO UNDER ARMOUR AND THE PUBLIC

63.     Fully aware of Under Armour's rights and its ongoing objection to the  mark, Defendant has acted knowingly, willfully, in reckless disregard of those rights, and in bad faith.

64.     Defendant's unauthorized use of the  has caused and is likely to continue to cause confusion, mistake, and deception as to the source or origin of Defendant's products, and to falsely suggest a sponsorship, connection, or association between Defendant, its products, and/or its commercial activities with Under Armour.

65.     Defendant's unauthorized use of the  mark is likely to dilute the distinctiveness and value of Under Armour's famous  mark.

66.     Defendant trademark applications for the  and  marks conflict with Under Armour's prior rights.

67.     Defendant's acts, described above, have damaged and irreparably injured and, if permitted to continue, will further damage and irreparably injure Under Armour and its  mark.

68.     Defendant's acts, described above, have irreparably injured, and, if permitted to persist, will continue to irreparably injure the public, who has an interest in being free from confusion, mistake, and deception.

### FIRST CLAIM FOR RELIEF
### Trademark Infringement Under
### Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1)

69.     Under Armour repeats and realleges each and every allegation set forth in Paragraphs 1 through 68 of this Complaint.

70.     Without Under Armour's consent, Defendant has used and continues to use in commerce reproductions, copies, and colorable imitations of Under Armour's registered marks in connection with the offering, distribution, and advertising of identical and/or related goods.  These actions have caused and are likely to cause confusion, or to cause mistake, or to deceive, in violation of Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1).

### SECOND CLAIM FOR RELIEF
### Trademark Infringement, False Designation
### of Origin, Passing Off, and Unfair Competition
### Under Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)

71.     Under Armour repeats and realleges each and every allegation set forth in Paragraphs 1 through 70 of this Complaint.

72.     Defendant's actions, as described above, have caused and are likely to cause confusion, or to cause mistake, or to deceive as to the origin, sponsorship, or approval of Defendant, its products, and/or commercial activities by or with Under Armour.  Defendant's actions thus constitute trademark infringement, false designation of origin, passing off, and unfair competition in violation of Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A).

### THIRD CLAIM FOR RELIEF
**Trademark Dilution Under Section**
**43(c) of the Lanham Act, 15 U.S.C. § 1125(c)**

73.     Under Armour repeats and realleges each and every allegation set forth in

Paragraphs 1 through 72 of this Complaint.

74.     Under Armour's ⬥ mark is famous, as that term is used in 15 U.S.C.

§ 1125(c), and was famous before Defendant's first use of ⬥ based on, among other things, the

inherent distinctiveness and federal registration of Under Armour's ⬥ mark and the extensive

nationwide use, advertising, promotion, and recognition of that mark.

75.     Defendant's actions, as described above, are likely to dilute the distinctive quality

of Under Armour's famous ⬥ mark by blurring in violation of Section 43(c) of the Lanham

Act, 15 U.S.C. §1125(c), as amended by the Trademark Dilution Revision Act of 2006.

### FOURTH CLAIM FOR RELIEF
**Trademark Infringement Under**
**Md. Code Bus. Reg. § 1-414 *et seq.***

76.     Under Armour repeats and realleges each and every allegation set forth in

Paragraphs 1 through 75 of this Complaint.

77.     Defendant's uses, without the consent of Under Armour, of reproductions and/or

colorable imitations of Under Armour's registered ⬥ mark in connection with the sale,

offering for sale, and/or advertising of goods or services, have caused and are likely to continue

to cause confusion or deceive as to the origin of those goods or services, and thus constitute

trademark infringement in violation of Md. Code Bus. Reg. § 1-414 et seq.

78.     Defendant's reproductions and/or colorable imitations of Under Armour's

registered ⬥ marks, and application of those reproductions and/or colorable imitations to

Defendant's advertising, labels, prints, receptacles, signs, or wrappers that are intended to be

used with goods or services and/or in conjunction with the sale or other distribution of goods or services in Maryland, constitute trademark infringement in violation of Md. Code Bus. Reg. § 1-414 et seq.

## FIFTH CLAIM FOR RELIEF
### Trademark Infringement, False Advertising, and Unfair Competition <u>Under Maryland Common Law</u>

79.     Under Armour repeats and realleges each and every allegation set forth in Paragraphs 1 through 78 of this Complaint.

80.     Defendant's actions, as described above, have caused and are likely to continue to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of Defendant with Under Armour, or as to the origin, sponsorship, or approval of Defendant, its products, and/or its commercial activities by or with Under Armour such that Defendant's acts constitute infringement of Under Armour's proprietary rights in its ⊏⊐ mark, misappropriation of Under Armour's goodwill in those marks, and unfair competition under Maryland common law.

81.     Defendant's actions, as described above, constitute false and misleading descriptions and misrepresentations of fact in commerce, which, in commercial advertising and promotion, materially misrepresent the nature, characteristics, and qualities of Defendant's products and constitute false and deceptive advertising under Maryland common law.

## SIXTH CLAIM FOR RELIEF
### Refusal of Defendant's Application Nos. 87421885, 87421889, 87423449, 88434376, 88434452, and 88434461 for Fraud on the PTO Under <u>Sections 37 and 38 of the Lanham Act, 15 U.S.C. §§ 1119, 1120</u>

82.     Under Armour repeats and realleges each and every allegation set forth in Paragraphs 1 through 81 of this Complaint.

83.     Defendant falsely represented, through its digitally altered specimens and/or sworn statements of use in support of the '885, '889, '449, '376, '452, and/or '461 Applications, that it was using the  and/or  for the goods identified in Paragraphs 38, 45, 52, and 60 above.

84.     At the time it submitted its digitally altered specimens and/or its false statements of use to the PTO for the '885, '889, '449, '376, '452, and/or '461 Applications, Defendant knew that it was not using the  and/or  for the goods identified in Paragraphs 38, 45, 52, and 60 above.

85.     The digitally altered specimens and/or false statements submitted with the '885, '889, '449, '376, '452, and/or '461 Applications were material to the PTO's decision to publish these Applications for registration.

86.     The digitally altered specimens and/or false statements submitted with the '885, '889, '449, '376, '452, and/or '461 Applications were made with the intent to deceive the PTO into believing that Defendant offered the goods identified in Paragraphs 38, 45, 52, and 60 above.

87.     The PTO published the '885, '889, '449, '376, '452, and/or '461 Applications for registration relying on Defendant's digitally altered specimens and/or false statements.

88.     Defendant's fraudulent specimens and/or statements have damaged and injured and, if permitted to obtain registration of the '885, '889, '449, '376, '452, and/or '461 Applications, will further damage and injure Under Armour.

89.     Defendant has committed fraud on the PTO and thus the '885, '889, '449, '376, '452, and/or '461 Applications should be refused pursuant to Section 37 and 38 of the Lanham Act, 15 U.S.C. §§ 1119, 1120.

## JURY DEMAND

Pursuant to Fed. R. Civ. P. 38, Under Armour respectfully demands a trial by jury on all issues properly triable by a jury in this action.

## PRAYER FOR RELIEF

WHEREFORE, Under Armour respectfully requests that this Court enter judgment in its favor on each and every claim for relief set forth above and award it relief including, but not limited to, the following:

A.      An Order declaring that Defendant's use of and applications to register the  mark infringe and dilute Under Armour's  mark and constitute unfair competition under federal and/or state law, as detailed above;

B.      An Order declaring that the '885, '889, '449, '376, '452, and/or '461 Applications for the  and  marks conflict with Under Armour's prior rights, as detailed above;

C.      A permanent injunction enjoining Defendant and its employees, agents, partners, officers, directors, owners, shareholders, principals, subsidiaries, related companies, affiliates, distributors, dealers, and all persons in active concert or participation with any of them:

1.      From using, registering, or seeking to register the  mark in any form including, but not limited to, in connection with any other wording or designs, and from using any other marks, logos, designs, designations, or indicators that are confusingly similar to and/or dilutive of Under Armour's  mark;

2.      From representing by any means whatsoever, directly or indirectly, that

Defendant, any products or services offered by Defendant, or any activities undertaken by

Defendant, are associated or connected in any way with Under Armour or sponsored by

or affiliated with Under Armour in any way;

3.      From assisting, aiding or abetting any other person or business entity in

engaging in or performing any of the activities referred to in subparagraphs B(1)-(2);

D.      An Order directing Defendant to destroy all products, packaging, signage,

advertisements, promotional materials, stationery, forms, and/or any other materials and things

that contain or bear Defendant's ⧖ mark or any other marks, logos, designs, designations, or

indicators that are confusingly similar to and/or dilutive of Under Armour's ⬡ mark;

E.      An Order directing the Director of the PTO to refuse '885, '889, '449, '376, '452,

and/or '461 Applications or, alternatively, directing Defendant to surrender/abandon these

applications with prejudice;

F.      An Order directing that, within thirty (30) days after the entry of the injunction,

Defendant file with this Court and serve on Under Armour's attorneys a report in writing and

under oath setting forth in detail the manner and form in which Defendant has complied with the

injunction;

G.      An Order requiring Defendant to account for and pay to Under Armour any and

all profits arising from the foregoing acts, and increasing such profits, in accordance with 15

U.S.C. § 1117 and other applicable laws including, but not limited to, Md. Code Bus. Reg.

§ 1-414 *et seq.*;

H.      An Order requiring Defendant to pay Under Armour damages in an amount as yet

undetermined caused by the foregoing acts and trebling such damages in accordance with 15

U.S.C. § 1117 and other applicable laws including, but not limited to, Md. Code Bus. Reg.

§ 1-414 *et seq.*;

      I.      An Order requiring Defendant to pay Under Armour all of its litigation expenses,

including reasonable attorneys' fees and the costs of this action pursuant to 15 U.S.C. § 1117 and

other applicable laws;

      J.      An Order requiring Defendant to pay Under Armour punitive damages for

trademark infringement and unfair competition under Maryland common law; and

      K.      Other relief as the Court may deem appropriate.


Dated:  October 8, 2019           Respectfully submitted,

                             */s/ Douglas A. Rettew*
                             Douglas A. Rettew (29815)
                             Danny Awdeh (88958)
                             Anna B. Naydonov (*pro hac vice* pending)
                             Patrick J. Rodgers (*pro hac vice* pending)
                             FINNEGAN, HENDERSON, FARABOW,
                               GARRETT & DUNNER, LLP
                             901 New York Avenue, NW
                             Washington, D.C. 20001-4413
                             (202) 408-4000 (phone)
                             (202) 408-4400 (fax)
                             Email: doug.rettew@finnegan.com
                             Email: danny.awdeh@finnegan.com
                             E-mail: anna.naydonov@finnegan.com
                             Email: patrick.rodgers@finnegan.com

                             *Attorneys for Plaintiff Under Armour, Inc.*